**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JESSE C. (JAY) CROSSON, PH.D, | |
| Plaintiff, | **Civil Action No.: 3:20-cv-18800-MAS-ZNQ** |
| -vs.- | **FIRST AMENDED COMPLAINT & DEMAND FOR TRIAL BY JURY** |
| TMF HEALTH QUALITY INSTITUTE, STEPHEN D. THOMAS, DEBBIE LOVATO, THOMAS MANLEY, ABC CORPORATIONS 1-5 (fictitious names describing presently unidentified business entities); and JOHN DOES 1-5 (fictitious names describing presently unidentified individuals), | |
| Defendants. | |

Plaintiff Jesse C. (Jay) Crosson, Ph.D. ("Plaintiff"), by way of this Complaint against Defendant TMF Health Quality Institute ("Defendant TMF" and/or "Corporate Defendant"), Defendant Stephen D. Thomas ("Defendant Thomas"), Defendant Debbie Lovato ("Defendant Lovato"), and Defendant Thomas Manley ("Defendant Manley") (collectively "Defendants"), alleges as follows:

## <u>INTRODUCTION</u>

This case concerns the precise discrimination and retaliation the New Jersey Law Against Discrimination ("NJLAD") N.J.S.A. 10:5-12 *et seq.* is intended to eradicate. Plaintiff is a high-level, dedicated corporate executive who was subjected to intentional, repeated, and unlawful retaliation for objecting to, and attempting to remediate, racial prejudice and discriminatory practices occurring in the workplace. Despite having been praised for his hard work, his

dedication, and his diligence in carrying out his duties, and despite having received not a single disciplinary action or reprimand at any point in time in his career with Defendant TMF, Plaintiff's career at Defendant TMF was finished when Plaintiff reported the misconduct and diversity issues through proper channels.

As discussed below, in blatant retaliation for engaging in protected conduct, Defendants intentionally thwarted Plaintiff's efforts to create a corporate culture that fostered inclusion and diversity, deliberately smeared his character to individuals throughout the company, made false accusations regarding his job performance and conduct in the workplace, interfered with his ability to carry out his duties, and subjected Plaintiff to a sham internal investigation, all in a concerted and coordinated effort to cover-up his eventual wrongful termination of employment.  When Plaintiff reported as much to his superiors, Defendants ignored the opportunity to take corrective action and immediately terminated his employment – ***the next business day under the guise of "a reduction in force."***

In short, while Defendant TMF claims "the company strives to ensure a workplace with a diverse team of people and professions … free of discrimination, intimidation, and harassment," this rhetoric is entirely hollow.  New Jersey law provides redress for individuals subjected to such treatment in the workplace.

## **PARTIES**

1.      At all relevant times herein, Plaintiff is a Jewish, Caucasian individual residing in Highland Park, New Jersey and was employed by Defendant TMF as a Quality Improvement Executive for Research and Assessment.  Plaintiff is a New Jersey citizen and worked for Defendants from his office in New Jersey.  At all relevant times, Plaintiff is a "person" and "inhabitant" of New Jersey as defined by the NJLAD.

2.      Defendant TMF has a principal place of business at 3107 Oak Creek Drive, Suite 200, Austin, Texas 78727. At all times relevant hereto, Defendant is an "employer" as defined under the NJLAD and directly employed Plaintiff and Individual Defendants.

3.      Defendant Thomas is a Senior Advisor to the President and CEO of Defendant TMF.  Defendant Thomas also serves as the Chief Human Resources Officer for the company. Defendant Thomas is, upon information and belief, a citizen of Texas.  This claim is brought against Defendant Thomas in his individual capacity and/or as an agent or servant of Defendant TMF during the course of his employment.

4.      Defendant Lovato is the head of Business Development of Defendant TMF. Defendant Lovato is, upon information and belief, a citizen of Texas.  This claim is brought against Defendant Lovato in her individual capacity and/or as an agent or servant of Defendant TMF during the course of her employment.

5.      Defendant Manley is the Chief Executive Officer for Defendant TMF.  Defendant Manley is, upon information and belief, a citizen of Texas.  This claim is brought against Defendant Manley in his individual capacity and/or as an agent or servant of Defendant TMF during the course of his employment.

6.      Defendant ABC Corporations 1 through 5 are currently unidentified business entities who have acted in concert with Corporate Defendant(s), and/or currently unidentified business entities responsible for the creation and/or implementation of harassment or anti-discrimination policies of Corporate Defendant(s), and/or currently unidentified business entities who have liability for the damages suffered by Plaintiff under any theory advanced herein.

7.      Defendants John Does 1 through 5 are currently unidentified individuals who acted in concert with Defendants and/or currently unidentified individuals responsible for the creation

and/or implementation of harassment or anti-discrimination policies of Corporate Defendant(s) and are currently unidentified individuals who may have liability for the damages suffered by Plaintiff under any theory advanced herein.

## JURISDICTION & VENUE

8.      This an action between citizens of different states. Plaintiff is citizen of New Jersey and Defendants, upon information and belief, are all citizens of Texas.

9.      The amount of the matter in controversy exceeds the jurisdictional minimum of $75,000.  *See* 28 U.S.C. § 1446(c)(2)(A).

10.     Personal jurisdiction looks to the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. New Jersey's long-arm statute permits the exercise of personal jurisdiction to the full extent allowed under the Due Process Clause.

11.     The Court has personal jurisdiction because Defendants conduct business in New Jersey and the transactions and occurrences that give rise to this lawsuit took place in New Jersey.

12.     Plaintiff has lived in New Jersey for the last 33 years (i.e., since 1987) and is a resident of Middlesex County.  Plaintiff obtained his master's degree and doctorate from Rutgers University.

13.     At all relevant times, Plaintiff paid New Jersey income taxes, paid monies into the New Jersey unemployment compensation system, and had medical insurance via a New Jersey based provider.  Plaintiff paid such taxes and premiums to New Jersey throughout his entire tenure with Defendants.  As a result of the wrongful termination by Defendants, Plaintiff currently receives New Jersey unemployment compensation benefits. Plaintiff's business and employment records are located in New Jersey. Plaintiff's medical providers, including his primary treating physician and therapist, are located in New Jersey.

4

14.    Defendant Thomas, Plaintiff's Direct Supervisor (Richard Kohl, Chief Medical Officer), and a representative from Human Resources interviewed Plaintiff via-teleconference while Plaintiff was in New Jersey.  Plaintiff was directly recruited by CMO Kohl.  CMO Kohl contacted Plaintiff by email and phone while Plaintiff was in New Jersey in August 2018.  CMO Kohl then facilitated a phone interview with Plaintiff, Defendant Thomas, and Defendant Manley. The interview lasted approximately one hour.  Plaintiff was in New Jersey at the time of the interview.

15.    After the interview, Plaintiff was provided with an initial Offer of Employment (dated 8/29/18), a revised offer (dated 9/5/18), and a final offer (dated 9/13/18), all of which were negotiated in New Jersey, sent to Plaintiff's New Jersey address, and executed by Plaintiff in New Jersey.

16.    Defendants recruited and negotiated Plaintiff's employment terms of employment while Plaintiff was in New Jersey. Defendants engaged in continuous phone calls, letters, videoconference calls, and emails to Plaintiff while he was in New Jersey.   Upon information and belief, Plaintiff's position was created specifically for him and he was recruited without other candidates being considered.

17.    During his employment with Defendants, Plaintiff worked almost exclusively from his office in Middlesex County, New Jersey, where he resides.  Defendant TMF paid $30 per month to offset Plaintiff's New Jersey cell phone costs.

18.    Plaintiff was provided a New Jersey-based cell phone beginning with area code "732".   Plaintiff's New Jersey number was Plaintiff's primary contact number for all company business.  Plaintiff's New Jersey address was Plaintiff's business address for physical mail and his signature block for all email communications was as follows:

Regards,

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and**
**Assessment**
**TMF Health Quality Institute**
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of*
*Health Care*

19.     Defendants expected Plaintiff to conduct his regular duties and maintain his

productivity from his New Jersey office. At all relevant times during Plaintiff's employment,

Defendants relied upon Plaintiff to perform essential functions from his office, which was located

in New Jersey.  Defendants provided Plaintiff with a company-issued laptop and remote access

software for Plaintiff to work from his desk in New Jersey.  Plaintiff accessed Defendants

technology and business records via a New Jersey Internet Service Provider.  Plaintiff was not

merely granted remote access and did not merely reside in New Jersey. Rather, it was an express

and substantial condition of Plaintiff's employment that he work from his office in New Jersey.

Plaintiff frequently conducted data analysis, meetings, and conference calls from his desk in New

Jersey.

20.     While working out of his New Jersey office, Plaintiff communicated with

Defendants via email, videoconference (WebEx), and telephone calls to discuss and perform work-

related matters.  While in New Jersey, Plaintiff engaged in continuous business, video conferences,

and phone/email interactions with Defendants and their clients.  From New Jersey, Plaintiff

supervised professional staff members in the Analytics Group and interacted with Human

Resources staff and other company staff to secure resources for this group.  Plaintiff designed and

led company-wide staff development training focusing on technical writing skills, all of which occurred or was completed while Plaintiff was in New Jersey.

21.    Plaintiff contributed to and led numerous business development proposals including writing technical content in response to funding opportunities and constructing and reviewing proposed budgets.    Plaintiff identified business development opportunities and facilitated contact with potential collaborators across the country.

22.    By hiring Plaintiff and stationing his office in New Jersey, Defendants purposefully availed themselves of the benefits of conducting business in New Jersey and purposefully directed their activities to New Jersey.

23.    Defendant TMF is a contractor to the Centers for Medicare and Medicaid Services. Defendant TMF has a wholly-owned subsidiary, C2C Innovative Solutions, Inc. ("C2C"), which has the same CEO and CFO as Defendant TMF.  Upon information and belief, the companies also share human resources functions.  Before Plaintiff was terminated the business development functions of the two companies were merged.  From his New Jersey office, Plaintiff helped to negotiate the contract providing business development software for both Defendant TMF and C2C as a shared service. C2C is a Qualified Independent Contractor for Medicare Part B claims review for the Part B North region. This region includes New Jersey.  Upon information and belief, C2C has clinical staff working in New Jersey for Defendant TMF.  In addition, Defendant TMF has a contract that provides services for CMS on a nationwide basis, including New Jersey. The contract analyzes Medicare billing and provides reports and technical assistance to health care providers in every state including New Jersey.   Plaintiff provided leadership and oversight for this contract from his office in New Jersey.

24.     Plaintiff's claims arise out of Defendants' activities and connections with New Jersey. Plaintiff's allegations concern discriminatory and retaliatory communications between Plaintiff and Defendant TMF employees. Plaintiff repeatedly reported discrimination and retaliation while working in New Jersey.  Plaintiff was terminated while working out of his New Jersey office.  At the time, the discriminatory and retaliatory acts took place, Plaintiff worked almost entirely in New Jersey and did not conduct any work in or from Texas; thus, his state of employment was New Jersey.

25.     Throughout Plaintiff's employment, he suffered discrimination, harassment, and retaliation while working in New Jersey. Plaintiff was subjected to retaliation, adverse employment action, and ultimately terminated while he was working and living in New Jersey. Defendants' alleged justification for terminating Plaintiff's employment are purely pre-textual and sent via letter and email to Plaintiff in New Jersey.

26.     New Jersey has a strong interest in protecting its residents from discrimination and retaliatory actions. This need for protection is even more necessary for New Jersey citizens working remotely for out-of-state employers. Plaintiff has a substantial nexus to New Jersey, as he paid New Jersey income taxes and conducted a substantial portion of his business from New Jersey.  New Jersey has a substantial interest in this litigation, as an "inhabitant" has invoked the rights and privileges afforded to him under New Jersey law. Defendants received continual benefits from this forum through Plaintiff's substantial work as a "Quality Improvement Executive for Research and Assessment" for the company.

27.     Although Plaintiff signed an offer letter outlining certain terms and conditions of his employment, Plaintiff did not sign an employment agreement and did **not** agree to litigate matters in Texas.  Plaintiff worked almost exclusively out his office in New Jersey.  When Plaintiff

had official meetings with Defendant TMF staff in locations outside of New Jersey, Plaintiff met with company leaders (including the Individual Defendants) and discussed business strategy in Baltimore, Maryland in late 2018 and again in February 2019 at conferences organized by the Centers for Medicare and Medicaid Services. Plaintiff also met with Defendant TMF staff members of the "Innovation Team" in Tampa, Florida at a conference sponsored by the Society of Teachers of Family Medicine focused where we discussed staff development and planned company training. Plaintiff traveled, from his New Jersey office, to meet with clients and attend conference in Virginia, Illinois, Florida, Washington D.C., and Canada. Plaintiff was never stationed out of Defendants' Texas office; he only visited Texas on company business a handful of times between 2018 and 2019.

28.    When Plaintiff's supervisor asked Plaintiff to take on management of the data analytics group within the company, he specifically noted that the company had determined that Plaintiff was to perform such work out of his New Jersey office, not Texas.

29.    Plaintiff has never held Texas health insurance and has paid no Texas taxes or disability/unemployment monies to Texas. Plaintiff did not have an assigned office in Texas; on the few occasions he visited Texas, Plaintiff used different offices assigned to "visitors." Plaintiff stayed in hotels when visiting Texas and his travel was fully reimbursed by the company because Texas was **not** his home office.

30.    Venue is proposed in the District Court under 28 U.S.C. § 1391 as the unlawful acts and practices of Defendants were committed within or upon Plaintiff within New Jersey and within this District.

### FACTS COMMON TO ALL CLAIMS

31.    Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

9

32.    Since 1984, Defendant TMF has been a Quality Improvement Organization in the business of improving care provided to Medicare beneficiaries through cooperative efforts with the health care community.

33.    Defendant TMF "promotes quality health care through contracts with federal, state and local governments, as well as private organizations" by "develop[ing] and implement[ing] a broad array of health care quality improvement projects."[1]

34.    Defendant TMF's mission statement is "to make measurable improvements in the quality and delivery of health care."[2]

35.    Defendant TMF's core values as stated on its website include "model integrity, embrace innovation, celebrate success, strive for excellence, foster trust and teamwork, and focus on those we serve."[3]

36.    According to the Defendant TMF's Employee Handbook, the Equal Employment Opportunity policy's purpose is ***"To ensure that the company provides equal opportunity for employment to all individuals and makes reasonable efforts to reflect an employee population that mirrors the state's diverse workforce."***

37.    Regarding the work environment, "the company strives to ensure a workplace with a diverse team of people and professions. This work environment is achieved through a productive, efficient workforce that is free of discrimination, intimidation, and harassment."

38.    But, as discussed herein, the aforementioned "Equal Employment Opportunity policy" exists in name only.

---

[1] https://www.tmf.org/Government-Services/Products-and-Services
[2] https://www.tmf.org/Company-Information/Company-Overview/Governance-Mission
[3] https://www.tmf.org/Company-Information/Company-Overview/Governance-Mission

39.     Despite these core values, Defendant TMF fostered a hostile and retaliatory work environment wrought with discriminatory and racist conduct committed by upper-management employees.

40.     Defendants also discriminated against Plaintiff due to his religion and retaliated against him immediately after he attempted to remediate the company's lack of equal opportunity measures and its refusal to make any real strides towards improving company diversity.

41.     At its core, the company suppressed minority employees, failed to provide minority employees with job advancement opportunities, failed to cultivate a culture of inclusion, and disproportionately promoted the careers of Caucasian employees.

42.     While in New Jersey, Plaintiff accepted the offer to work at Defendant TMF on September 13, 2018.  Plaintiff was to work out of his office in Middlesex County, New Jersey.

43.     Plaintiff's direct supervisor was Russell Kohl, Defendant TMF's Chief Medical Officer, Innovations Team.

44.     Plaintiff was hired as the Quality Improvement Executive for Research and Assessment with Defendant TMF.

45.     While discussing the position in August 2018, Dr. Kohl praised Plaintiff's work performance and potential contributions to the company:

- "The folks on the call were all very comfortable with your vision, style and capabilities and would like to delve into the logistical specifics in a way that might enable us all to make decisions by the end of this week."

- "We are creating a new position for you."

- "While I do anticipate that it will ultimately involve directing projects and managing the associated staff, I'd like to keep you engaged with the analytics and  innovation teams for a portion of your time."

- "… we'd like to use the Senior Innovation Strategist/Researcher position to get you in the door without having to wait for the

11

development of a fully new position (generally takes a month or two)."

- "I'd like to get your views across our work before tying you to a specific team."

46.    As part of his job duties, from his New Jersey office, Plaintiff was responsible for the Data Analytics Group where he mentored senior professionals, led staff recruitment, and strategically managed resources across multiple projects for Defendant TMF.

47.    During the course of his employment, from his New Jersey office, Plaintiff increased billable hours within the Data Analytics group by 30%.

48.    From his New Jersey office, Plaintiff also designed and implemented a company-wide writing program for Defendant TMF, focused on reducing proposal development costs and improving technical proposal quality.

49.    From his New Jersey office, Plaintiff provided subject matter expertise and quality assurance reviews across a multitude proposals potentially worth tens of millions of dollars and on multiple funded projects.

50.    With Plaintiff's consultations and revisions of proposals, which he completed from his New Jersey office, Defendant TMF successfully increased its Quality Improvement Organization service area adding an additional state.

51.    Further, as part of his role with Defendant TMF, Plaintiff led the adoption and implementation of new accounting and business development software while simultaneously negotiating a 58% cost reduction for said software and other services.

52.    Overall, Plaintiff has proved to be an exceptional employee, evidenced also by the following performance evaluations, for Defendant TMF by increasing revenue, decreasing costs, and improving the quality of employee's work.  Specifically:

From: Russell Kohl
To: Jay Crosson
Subject: FW: Jay Crosson - 2019 Executive KPIs
Date: Thursday, January 16, 2020 10:54:58 AM
Attachments: Adobe Digital Signature Instructions for PAF.pdf Jay
Crosson 2019 KPIs.pdf

Attached is your 2019 KPI sheet. ***You blew it out of the water.***
Please sign via adobe and return it to me…

***Russell Kohl, MD, FAAFP***
TMF Health Quality Institute

….

From: Fred Staeck
To: DG_Innovation Team
Subject: Jay getting Kudos during CEO Roundtable with remote
employees today
Date: Wednesday, May 29, 2019 4:20:48 PM

Jay was complimented several times by Tom Manley during our
CEO Roundtable with several remote folks. The compliments were
around 12th SOW contributions and helping TMF respond to a
changing landscape.

***Congrats Jay!***

Hope this isn't embarrassing Jay, but good news should also travel
fast.

Fred

Fred Staeck RN, BSN, PMP
Innovation Project Manager
TMF Health Quality Institute
3107 Oak Creek Drive, Suite 200 Austin, TX 78727-3107
Phone: (678) 943-1226
Email: Fred.Staeck@tmf.org
Web sites: www.tmf.org or http://tmfqin.org
**…**

From: Russell Kohl
To: Jay Crosson
Subject: Annual Review
Date: Thursday, October 24, 2019 5:22:37 PM

13

Attachments: Crosson 2019 Perf Eval.pdf

***You're doing awesome and pushing us to be better!***

Russell Kohl, MD, FAAFP
Chief Medical Officer
TMF Health Quality Institute
3107 Oak Creek Drive, Suite 200 Austin, TX 78727-3107
Phone: (405) 706-3821
Email: Russell.Kohl@tmf.org
Web sites: www.tmf.org or http://tmfqin.org

### Performance Evaluation

| Employee's Name:<br>Jesse "Jay" Crosson, PhD | | Employee's Job Title:<br>Quality Improvement Exec, Research and Assess | |
|---|---|---|---|
| Evaluator's Name:  Russell Kohl, MD | | Evaluator's Job Title: Chief Medical Officer | |
| | **Key Performance Indicators (KPI)** | **Standard/Expectation** | **Achieved (Year-End)** |
| 1) | Oversees, coordinates and manages health research projects | Identify and participate in the development of topical pilot projects | ☒ Yes  ☐ No |
| 2) | Collaborates with the Business Development Department | Lead the preparation and submission of contract and grant proposals | ☒ Yes  ☐ No |
| 3) | Oversees and provides consultation to company teams | Conduct interviews and analysis to properly define challenges/potential solutions | ☒ Yes  ☐ No |
| 4) | Represent TMF research capabilities externally | Build new relationships with potential funders, govt agencies, and collaborating research | ☒ Yes  ☐ No |
| 5) | | | ☒ Yes  ☐ No |

**Initial Meeting**                                         **Date:** 11/28/18

| Initial meeting held to discuss expectations and establish above KPI's |
|---|

**Mid-Year Meeting**                                    **Date:** Ongoing 2019

| Weekly meetings on project performance were held, along with intermittent touchbases on individual career planning |
|---|

**Year-End Meeting**                                    **Date: 10/24/19**

| ***Dr Crosson has brought invaluable competencies and energy to TMF. His active participation in the external implementation and research environments have provided the*** |
|---|

*company with enhanced business development and collaboration opportunities, while his internal leadership and management skills strongly contributed to winning the NQIIC contract vehicle for TMF. He approaches situations thoughtfully and with a genuine desire to enhance both individual and corporate capabilities in a manner that both resolves the immediate issues and sets a firm foundation for future success.*

53.     Plaintiff also received a bonus of over $16,000 as recent as February 21, 2020 for his "invaluable competencies and energy… active participation… leadership and management skills… [and] he approached situations thoughtfully and with a genuine desire to enhance both individual and corporate capabilities…"

### Plaintiff Was an Excellent Employee and Ambassador for Company Diversity Initiatives – That All Changed When Plaintiff Reported Racist Conduct and Exposed the Company's Failed Equal Opportunity Policies

54.     After noticing a number of red flags, and as a part of his executive position with the company, Plaintiff repeatedly attempted to broaden the company's antiquated policies and initiatives in connection with diversity matters.

55.     On April 28, 2020, from his New Jersey office, Plaintiff held a conference call with Teri Shea, an HR Specialist who is responsible for maintaining Defendant TMF's Affirmative Action Plan ("AAP").  Plaintiff conduced this call from his New Jersey office while using his New Jersey based number, computer, and internet.

56.     The purpose of this call was to discuss the educational qualifications on professional level job descriptions that Plaintiff was working on as part of his duties to reorganize the analytics group of Defendant TMF. Ms. Shea had been repeatedly resisting the addition of educational qualifications; however, her reasoning was nonsensical and unsupported.

57.     Plaintiff expected the call to illuminate this back and forth between Ms. Shea and himself, but he did not expect to be met with racist views and troubling backlash.

58.     Ms. Shea, despite maintaining the AAP at Defendant TMF, proceeded to tell him

no educational requirement could be included for these highly technical jobs because **"*black people do not get masters and doctoral degrees at the same rates.*"**

59.     From his New Jersey office, Plaintiff immediately objected to Ms. Shea – explaining that her comment and views were unequivocally racist.

60.     Plaintiff was forced to hang up the phone due to Ms. Shea's abrasive reaction after Plaintiff told Ms. Shea that her statement was racially prejudiced.  Plaintiff told Ms. Shea, **"*this conversation is disturbing on so many levels that I can no longer continue having it with you.*"**

61.     From his New Jersey office, Plaintiff reported the racist behavior and comments to his direct supervisor, Russell Kohl, who instructed him to report it to Ty Clift, the Director of Contracts and Compliance.

62.     From his New Jersey office, Plaintiff reported the interaction via phone and email on April 28, 2020 that same day.  Plaintiff also reported a more general concern that the company had a general problem with diversity culture and inclusion of minority employees. Specifically:

> From: Jay Crosson
> To: Ty Clift
> Subject: HR interaction
> Date: Tuesday, April 28, 2020 5:41:00 PM
>
> Hi Ty,
>
> Here is a summary of the interaction I had with Teri Shea in HR today:
>
> - Teri has been working with me on revising the Analytics Group job descriptions in line with the reorganization that you and I have previously discussed. Throughout this process, she has repeatedly resisted my efforts to ensure that the job descriptions align with my assessment of the needs of TMF for a successful and productive analytics group. Key to this reorganization is increasing the professional expectations that TMF has for senior analytics group staff. As part of this, I have determined that we need more consistent and professionally-aligned educational and

training requirements for potential recruits. Specifically, I have determined that entry-level analysts should have a bachelor's degree (or experiential equivalent), that senior analysts should have a master's degree (or experiential equivalent), and that senior data scientists should have a doctoral degree (or experiential equivalent). The current senior staff in the analytics group all agree with this assessment. As I have tried to implement these changes, Ms. Shea has consistently refused to implement these changes.

- Earlier today, I sent her two emails (forwarded separately to you). One thanking her for her work on the entry level positions and making some final minor modifications to those descriptions. The second email indicated to her that her changes to the senior level positions were still not acceptable as they did not include the appropriate educational qualifications for the position.

- At approximately 2:15 pm central time today, I called Ms. Shea to discuss the educational qualifications issue. We have previously discussed this issue multiple times and I have made my requirements clear to her each of these times. Today, when I pressed her to include the master's level qualification, she told me I needed to describe to her what someone would learn in that training that was required for the job. I gave her a high-level answer focused on training in study design and methods as it would not be appropriate to explain to her all of the training that typically is entailed in master's level training in statistics or epidemiology. She then indicated that this would be a problem from an equal employment opportunity perspective. I asked her to explain how that could possibly be the case. **She then proceeded to tell me that "black people" don't get master's and doctorates at "the same rates" and so therefore this would constitute some sort of discrimination. I pointed out to her that this statement was in itself a "racist statement". She then said that she is "not being racist" by saying this. I reminded her that I was not saying that she was being racist but rather that the statement she made was a racist one. She then got more confrontational about this and I cut her off saying "this conversation is disturbing on so many levels that I can no longer continue having it with you." I then hung up.**

There are several serious issues raised by Ms. Shea's actions:

- Her consistent refusal to meet the needs of the analytics group in a collaborative way has created additional work for

strategic direction and management of the analytics group in alignment with the direction agreed upon by senior leadership. The barriers that she has put forth throughout this process have interfered with efficient management and constitute a barrier to recruiting appropriately trained staff to support our work.

- The racist effect of her interpretation of EEO rules and HR procedures. By lowering the educational expectations for these positions, TMF presents a less inviting workplace to minority candidates who have the appropriate training for the positions. Moreover, hiring individuals without the right educational preparation sets those individuals up for less successful careers.

- The "fact" that "black people" don't get advanced degrees in a large enough number to be able to hire them is preposterous. The first African American to earn a PhD in the US was W. E. B. Du Bois. He earned his degree from Harvard in 1896. While African Americans face reduced educational opportunities in America, there are literally tens of thousands of African Americans with masters or doctoral level training.

- Lowering the educational requirements of these highly technical jobs at TMF will have the likely effect of discouraging African Americans with this level of training from applying as they will assume that they are over-qualified for the position.

***The lack of diversity at TMF has troubled me for some time. I see now that the issues go beyond the applicant pool.***

Thank you for discussing this with me today.

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-[redacted]
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
***Improving Lives by Improving the Quality of Health Care***

63.     Despite the disturbing and racist nature of these comments by Ms. Shea, Plaintiff

did not receive a response from Ty Clift for nearly two (2) weeks.  Plaintiff thus followed up asking

about next steps.  Specifically:

> From: Jay Crosson <Jay.Crosson@tmf.org>
> Sent: Friday, May 8, 2020 8:38 AM
> To: Ty Clift <Ty.Clift@tmf.org>
> Subject: Following up on HR
>
> Hi Ty,
>
> Have you completed your examination of the HR issues I raised? If
> so, what are the next steps? I would like to proceed with the
> revisions of the job descriptions for the analytics group as soon as
> possible.
>
> Regards,
>
> Jay
>
> **Jay Crosson, Ph.D.**
> **Quality Improvement Executive, Research and Assessment**
> **TMF Health Quality Institute**
> Phone: 732-[REDACTED]
> Email: jay.crosson@tmf.org
> www.tmf.org or http://tmfqin.org
> *Improving Lives by Improving the Quality of Health Care*

64.     Aware of the gravity of the comments made by Ms. Shea, Russell Kohl emailed

Plaintiff about a follow up from Ty Clift.  Dr. Kohl himself highlighted the ***"importance of***

***diversity"***:

> From: Russell Kohl <Russell.Kohl@tmf.org>
> Sent: Monday, May 11, 2020 12:34 PM
> To: Jay Crosson <Jay.Crosson@tmf.org>
> Subject: HR Interaction Follow-Up
>
> I wanted to follow-up to ensure that you had a resolution from Ty
> regarding the incident. I spoke with him last week and understood
> that he was going to get back with you, but the connection was
> pretty bad.

*Relately, I had a discussion with Tom about the importance of diversity of thought and the impacts that institutional racism could play in that, particularly when it comes to differential academic standards.* He was very interested in the idea of focusing some recruiting efforts directly towards underrepresented groups who have the desired academic credentials- such as direct relationships with historically underrepresented academic centers (HBCU's, Native American Institutions, Hispanic Universities, etc). *I suggested that we take our learnings from the analytics team interns and see if we might be able to develop an ongoing internship-like model to actively engage diverse candidates early in their training/careers- which he was very interested in.* Additionally, the University of Puerto Rico could be another location that we might look into for their data analytics capacity and a possible partnership or recruitment venue…

Thoughts?

Russell Kohl, MD, FAAFP
Chief Medical Officer
TMF Health Quality Institute
3107 Oak Creek Drive, Suite 200 Austin, TX 78727-3107
Phone: (405) 706-3821
Email: Russell.Kohl@tmf.org
Web sites: www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

65.    Plaintiff responded to Dr. Kohl, stating he had not heard back from Ty Clift, but he

appreciated Dr. Kohl's efforts.

From: Jay Crosson
To: Russell Kohl
Subject: RE: HR Interaction Follow-Up
Date: Monday, May 11, 2020 12:40:00 PM

*I have not had a resolution on that from Ty as of yet.* I sent him an email but he did not reply to that one. I'll follow up with him by phone to see what he thinks, as I would still like to move forward with the job description and title changes as soon as possible. I am holding off on promotion for Nicole until after that gets resolved, but I am thinking I should probably move forward on that regardless. What do you think?

*Thanks for bringing the diversity issue up with Tom. I am heartened by his response and like your ideas about how to move*

*forward on this issue. Once you are back, I would be happy to work on it with you and start thinking about how to make this happen.*

Warm regards,

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

66.    About two (2) weeks after the incident with Ms. Shea, Ty Clift responded to Plaintiff. His reply consisted of nothing more than several half-hearted ideas and was a clear attempt to downplay the comments.  All of these communications were to Plaintiff, or from Plaintiff, while he worked out of his New Jersey office.

67.    Ty Clift, and in turn the company, made the decision to double-down on Ms. Shea's comments and endorse her approach to hiring initiatives:

> From: Ty Clift <Ty.Clift@tmf.org>
> Date: Monday, May 11, 2020, 3:50 PM
> To: Jay Crosson <Jay.Crosson@tmf.org>
> Subject: RE: Following up on HR
>
> Hi Jay,
>
> I meant to get back to you earlier. I have spoken with multiple people including Stephen and Teri independently, and researched documentation and websites. Here is what I found, breaking it into two categories: 1) comments made in yours and Teri's phone call; and 2) appropriate position descriptions.
>
> 1) Teri made her comments from the perspective of being the person at TMF who maintains our Affirmative Action Plan (AAP), and interfaces with the EEOC and OFCCP including periodic audits. She works with adjusting TMF's EEO goals, incorporating feedback from external sources on the adequacy of TMF's efforts. She also

21

reviews external information on job applicant pools and statistical factors to consider in making best efforts to meet our goals, and AAP compliance.

Having learned this detail through multiple discussions and material review, I recommended to HR is that it is appropriate to preface a comment on a sensitive topic with a qualification about statistical trends or a similar reference. My understanding is that is what Teri intended by stating that restricting position descriptions to people with higher education degrees could introduce EEO risks. However, there was already disagreement and frustration in your phone call, and (with hindsight) it would have been more appropriate to reset the discussion with a neutral reference to how TMF manages its AAP, and guidance on compliance risks like the following: https://www.eeoc.gov/foia/eeoc-informal-discussion-letter-217. Let me know if you would like to discuss this further.

2) There should be a strategic discussion, perhaps including Tom, about the potential benefits and risks of rewriting existing position descriptions and future job postings with requirements for higher education degrees. Other than requiring bachelor degrees, TMF limits higher-level requirements to positions requiring licensure, like CPA, MD, or RN. A Masters or PhD when desired is stated as preferred. This is consistent with job postings I reviewed for data scientists, researchers, analysts on peer websites like Booz Allen Hamilton and Accenture.

Organizations that perform and brand themselves as research and development leaders have different approaches. That 'branding' is something TMF should discuss, as it could help avoid or defend against an EEO complaint. I reviewed the career websites for Mathematica, The RAND Corporation, and The Brookings Institution.

- Mathematica has job listings with PhD or Masters as requirements, but overall describes the environment that successful candidates will be joining in working with fellow PhDs in conducting sophisticated research. In doing so Mathematica risks that, for example, someone with a Masters in Epidemiology and highly qualified experience may claim discrimination by the PhD requirement (could be internal or external complaint). But that is their calculated risk, which is mitigated to an extent by the details of the job description and corporate environment.
- The Brookings Institution has a careers landing page that essentially says they perform PhD level research and they look for PhDs. This is further extrapolated in their different

job descriptions. In my opinion, their corporate experience and branding offers significant risk mitigation. ·

- The RAND Corporation has an interesting careers page https://www.rand.org/jobs.html. It opens with extensive messaging on diversity including a video, a written message from the CEO, and statistical bar charts on the demographics of the company including its board members. I don't know if this a result of proactive compliance, previous scrutiny, how they analyze everything they do, or a combination of these factors. The job postings I reviewed included one that required a PhD for work on a Defense contract, and a Data Scientist that stated a Masters was preferred.

My summary recommendation is that unless TMF is going to simultaneously create a branding campaign, adding hard requirements for advanced degrees to its job descriptions would create EEO risks. Those risks can be mitigated by stating that the higher degree is "preferred", and/or by allowing substitution of a bachelors plus specific years of experience or certifications.

Ty Clift
Director of Contracts and Compliance
TMF Health Quality Institute
512.334.1740
Ty.clift@tmf.org

68.     Plaintiff replied to Ty Clift stating: "I appreciate your attention to this sensitive issue. I will follow up with Russell when he returns next month to determine appropriate next steps."

69.     Plaintiff then sent another email to Ty Clift with examples of job descriptions with educational requirements similar to what Plaintiff sought to post that are being used.

70.     Ty Clift stated, ***"research and development leaders have different approaches"*** and therefore Defendant TMF would need to ***"create a branding campaign"*** to avoid the alleged EEO risks, but Plaintiff was able to find four (4) examples in the same sphere as Defendant TMF in approximately one (1) hour.

71.     It became clear that Ty Clift was covering up the diversity issues Plaintiff was

23

attempting to fix at Defendant TMF with bogus and inapplicable research:

> From: Jay Crosson <Jay.Crosson@tmf.org>
> Sent: Monday, May 11, 2020 4:46 PM
> To: Ty Clift <Ty.Clift@tmf.org>
> Subject: RE: Following up on HR
>
> Hi Ty,
>
> I did some looking around again at our competitors and peers (excluding the research and development firms) and found a number of positions at a comparable level of expertise with Master's degree or advanced degree required. Here are some:
>
> - The "Manager of Biostatistics" and "Senior Quality Improvement Facilitator" positions at Telligen: https://www.telligen.com/current-openings/
> - The "Senior Business Intelligence Developer" position at HSAG: https://hsag.jobs.net/enUS/job/sr-business-intelligence-developer/J3N85C6LTMR46Q6Y5J1
> - The "Communications Director" position at HQI: https://www.hqi.solutions/careers/communications-director/
> - The "Health Data Analyst" and "Project Manager" positions at The Carolinas Center for Medical Excellence: https://www.thecarolinascenter.org/default.aspx?pn=Careers
>
> These companies are all direct competitors and peers of TMF in the quality improvement space.
>
> Regards,
>
> Jay
>
> **Jay Crosson, Ph.D.**
> **Quality Improvement Executive, Research and Assessment**
> **TMF Health Quality Institute**
> Phone: 732-[REDACTED]
> Email: jay.crosson@tmf.org
> www.tmf.org or http://tmfqin.org
> *Improving Lives by Improving the Quality of Health Care*

72.     Backpedaling from his original insufficient points, Ty Clift responded to Plaintiff calling his job postings a ***"riskier path."*** Specifically:

From: Ty Clift <Ty.Clift@tmf.org>
Date: Monday, May 11, 2020, 6:19 PM
To: Jay Crosson <Jay.Crosson@tmf.org>
Subject: RE: Following up on HR

Hi Jay,

There is definitely a mix out there. I can tell you from speaking
with Stephen, Walter, and Tom, TMF is risk averse on this. It is
not illegal to post job descriptions like the ones you referenced, but
something like requiring a Masters Degree for HQI's
Communications Director would be easy to challenge. That
position should require a bachelors, and it is fine to state a masters
is preferred.

***I don't think TMF is willing to go down the riskier path.***

Ty Clift
Director of Contracts and Compliance
TMF Health Quality Institute
512.334.1740
Ty.clift@tmf.org

73.     Plaintiff was baffled by the company's stance.  Plaintiff clarified, again, that his

goal was to create a ***more, not a less***, diverse and welcoming environment:

From: Jay Crosson
To: Ty Clift
Subject: RE: Following up on HR
Date: Monday, May 11, 2020 7:54:54 PM

Thanks

I do not agree that I am advocating a riskier path than the current o
ne. ***My focus I on trying to create an environment that is more
diverse, welcoming, and inclusive.***

Regards

Jay
Sent with BlackBerry Work (www.blackberry.com)

74.     After the countless back and forth and focused attention from upper-management

on the racist comments made by Ms. Shea, the complaint and conduct were found to be

*unsubstantiated* even though they were reported on the same day by one of the two total people in the conversation. Again, all of these communications were to Plaintiff, or from Plaintiff, while he worked out of his New Jersey office.

75.    It is clear from the comment by Human Resource's Ms. Shea ("***black people do not get masters and doctoral degrees at the same rates***"), the workplace culture, hiring practices, and values of Defendant TMF are those that invite and perpetuate discrimination toward minorities.

76.    Even worse, following Plaintiff's complaints, Defendants engaged in a concerted effort to derail Plaintiff's diversity efforts and retaliate, ultimately resulting in his wrongful termination.

<u>**Civil Unrest and Increased Awareness of Systemic**</u>
<u>**Racism in the Wake of George Floyd's Murder**</u>

77.    On May 25, 2020, George Floyd was handcuffed and pinned to the ground face down by a police officer's knee on his neck until he died on the street. Two other police officers prevented many bystanders witnessing the slow and painful death from intervening.

78.    George Floyd's death triggered worldwide protests against police brutality, racism, and lack of accountability.

79.    From his New Jersey office, Plaintiff reached out to Russell Kohl to suggest that the company make a statement in response to express solidarity with the Black community and to show support for the company's minority employees.

80.    On June 1, 2020, Plaintiff also volunteered his time to help with diversity and inclusion work in any way. Specifically:

> From: Jay Crosson
> To: Russell Kohl
> Subject: diversity initiative
> Date: Monday, June 1, 2020 4:05:00 PM

Let me know what I can do to help with the diversity and inclusion work.

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

81.    The next day, protests began in Austin, Texas, near where Defendant TMF is headquartered.

82.    From his New Jersey office, Plaintiff emailed Dr. Kohl again about ***"making a statement by email to TMF employees committing TMF to fighting racism."***

83.    Plaintiff suggested the company engage in more focused recruiting, a public statement regarding the incident, and a statement of support to all TMF employees in line with the company's core values of ***integrity*** and ***teamwork***. Specifically:

From: Jay Crosson
To: Russell Kohl
Subject: Minneapolis ... and Austin
Date: Tuesday, June 2, 2020 11:57:00 AM

Hi Russell,

I am not sure if you have seen this news from Austin: https://www.kxan.com/austin-george-floydmike-ramos-protests/man-in-critical-condition-after-being-hit-by-less-lethal-round-during-austindemonstrations/

I know that the Austin police have opened an investigation into this incident and it is likely that there are many others throughout the years that have not been publicized. ***I think it would be helpful for Tom to make a statement by email to TMF employees committing TMF to fighting racism, ensuring that all members of the staff have a home at TMF, and offering support services to staff who may need them during this upsetting period.***

Regards,

Jay

Jay Crosson, Ph.D.
Quality Improvement Executive, Research and Assessment
TMF Health Quality Institute
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

84.     Rather than laud Plaintiff for taking such initiatives, Plaintiff received nothing but

pushback and consternation regarding the various diversity efforts.

85.     On June 15, 2020 as a follow up from emails from Dr. Kohl and Defendant Manley

about an internship program, Dr. Kohl emailed a draft of the proposed internship program to

Plaintiff for his thoughts.  From his New Jersey office, Plaintiff replied as follows:

> From: Jay Crosson
> To: Russell Kohl
> Subject: RE: First Draft Internship Program
> Date: Tuesday, June 16, 2020 3:09:00 PM
>
> Hi Russell,
>
> Thanks for the opportunity to review and comment on the internship
> proposal. I think this is a good start. My initial thoughts on this are
> as follows:
>
> - An internship program is a great idea and targeting the
>   marketing of it to HBCUs and other settings where we are
>   likely to increase our chances of getting qualified minority
>   applicants is a good way to help diversify our workforce over
>   time.
> - The compensation for the internship is lower than some
>   competitors but not unreasonably so.
> - In terms of eligibility, it is probably not necessary to specify
>   anything beyond the second bullet ("formally enrolled") and
>   then to state that applications will be "competitively
>   reviewed" since the "legal authority to work" is specified in
>   the Application Process section.

- For the application process, I think we should ask for an official transcript rather than just GPA verification.
- Rather than creating a program across all of the areas you list, I suggest starting with a small number of areas and clearly describing what an applicant would need to show in order to be selected along with as detailed a description of the learning objectives as possible.
- I like the lecture/discussion series and the formal assignment of a mentor.
- I think specifically adding a statement that interns will "shadow" mentors on existing projects would be good.
- In addition to a written report, I think it would be good for students to present their findings and to open those presentations to anyone in the company.

I have a couple of more general comments on diversity, equity, and inclusion:

- The justification of diversity as a "competitive differentiator" is likely not accurate since many of our competitors have similar emphases and several have more robust diversity, equity, and inclusion efforts already under way.
- Alternatively, some of the reasons that I think we should work to improve diversity, equity, and inclusion at TMF are: 1) treating people equitably should be an essential part of any ethical corporate culture and increasing diversity and including diverse life experiences and backgrounds is the right thing to do; 2) increasing the diversity of our staff will increase the efficiency of our work by broadening the range of skills and experiences that we include in the planning and execution of work for our clients; 3) actively working on these issues moves us beyond mere legal compliance to positively expressing our values; 4) some potential clients require active efforts to address diversity, equity, and inclusion (for example, many health foundations have this as a specific evaluation criteria when scoring applications for contracts and grants); and 5) much of our work includes patient and family engagement efforts where a diverse workforce can be part of enhancing our corporate cultural competence and thereby increasing our effectiveness.

*__Beyond the internship program, I think TMF needs to add diversity, equity, and inclusion to our list of core corporate values and then develop an internal initiative to operationalize and publicize those values and how they fit with and inform our other core values.__*

*Finally, the silence of company leadership on racism at this time is likely to present a barrier when seeking more diverse candidates for either the internship or employment more generally moving forward. The longer we wait to speak out, the more it will look like we are speaking from a position of guilt rather than one of commitment on these issues. Our work is intended to improve the lives and health of Medicare beneficiaries specifically and of all Americans more generally. Given that background I find it incongruous that we are unable to say that Black Lives Matter.*

Regards,

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

86.    Dr. Kohl responded that the statement was reviewed by corporate counsel.  Dr. Kohl claimed that the counsel determined that if Defendant TMF put out a statement like the one Plaintiff emailed, the company would ***never*** get another "CMS contract" again.

87.    That response (which is obviously false) raised alarms bells that Defendant TMF purported diversity values were a farce.  Worse, Plaintiff feared that his efforts were beginning to create tension and that he could be subjected to retaliation for exposing (and trying to remediate) the company's diversity issues.

88.    On July 2, 2020, Plaintiff shared, from his New Jersey office, a "confronting structural racism in research and policy analysis" article with the head of communications, Emilie Fennell, who then forwarded the article to Defendant Manley and Defendant Thomas.  Plaintiff never received any response.

89.    Ironically, Ms. Fennell is now the designated lead for an internal diversity group

with Defendant TMF that is also a pretextual committee and is in name only.

90.     Due to the above, and a result of how the company handled Ms. Shea's racist comments and subsequent investigation, Plaintiff took it upon himself to correct matters that were or could be perceived as discriminatory.

91.     For example, on July 7, 2020, from his New Jersey office, Plaintiff reached out to Piyusha Joshi, an analytic staff member, who had been called by her last name instead of her first by Wendy Bradley, LPC,CCAC - Director Comprehensive Primary Care, Plus.  Plaintiff addressed the matter head-on:

> From: Jay Crosson <Jay.Crosson@tmf.org>
> Sent: Tuesday, July 7, 2020 7:45 AM
> To: Piyusha Joshi <Piyusha.Joshi@tmf.org>
> Subject: Misuse of your name
>
> Hi Piyusha,
>
> I noticed in Wendy's last email to you that she referred to you by your last name rather than your first name. I pointed this error out to her and if it happens again on an email that I am not copied on, please let me know and I will follow up accordingly. Please don't hesitate to let me know if there are other instances in which you are experiencing these types or other sorts of microaggressions. If you would like to talk more please let me know.
>
> Sincerely,
>
> Jay
>
> Sent with BlackBerry Work
> (www.blackberry.com)

92.     Ms. Joshi responded to Plaintiff thanking him for his help.

> From: Piyusha Joshi <Piyusha.Joshi@tmf.org>
> Sent: Tuesday, July 7, 2020 9:05 AM
> To: Jay Crosson <Jay.Crosson@tmf.org>
> Subject: RE: Misuse of your name

I appreciate you noticing that error!...although it does not matter much, I did want to let her know that Joshi is my last name, just so that she knows.
Thank you for the help!

93.     On a call about the project, Defendant Lovato, lead of business development, misgendered Ms. Joshi.   From his New Jersey office, Plaintiff respectfully reached out to Defendant Lovato, alerting her that she had made a mistake, so she did not continue to do so.

From: Jay Crosson
Sent: Tuesday, July 7, 2020 10:05 AM
To: Debbie Lovato <Debbie.Lovato@Tmf.Org>
Subject: regarding Piyusha

Hi Debbie,
I hope this message finds you and your family well. I noticed on the call yesterday that you referred to Piyusha as "he", however, Piyusha identifies as a woman. I'm just letting you know so that you don't make this mistake in the future.

Regards,

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
Pronouns: he, him, his
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

94.     Concerned about the staffer and her blatant exposure to microaggressions by various employees at Defendant TMF, Plaintiff emailed her stating he is available to her if there are other instances of microaggressions and that he would follow up:

From: Jay Crosson
To: Piyusha Joshi
Subject: misgendering on the call yesterday
Date: Tuesday, July 7, 2020 10:07:00 AM

Hi Piyusha,

I noticed on the call yesterday that Debbie referred to you twice as "he" rather than "she" or by your name. I pointed this error out to her. If it happens again on a call that I am not on, please let me know and I will follow up accordingly. Please don't hesitate to let me know if there are other instances in which you are experiencing these types or other sorts of microagressions. If you would like to talk more please let me know.

Sincerely,

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
Pronouns: he, him, his
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

95.    From his New Jersey office, Plaintiff alerted Dr. Kohl of this obvious pattern and the need for leadership to address the issues. Although Dr. Kohl agreed that the above was improper, Plaintiff never received additional response from Dr. Kohl, from human resources, or the company.

96.    Later in July 2020, Plaintiff became concerned about the new hire screening process for his analytics team as it appeared that no Black or Latino candidates had made it through the screening.

97.    Before drawing any conclusions based on the pattern of discriminatory practices at Defendant TMF, Plaintiff asked Human Resources to share the demographics of the original applicant pool.

98.    The Human Resources staffer, who worked directly for Defendant Thomas, stated that sharing the demographics would violate Equal Employment Opportunity rules because

Plaintiff may use the information to discriminate against the applicants that passed through the screening process. Plaintiff's goal always been to *increase* diversity at Defendant TMF and he thus was dumbfounded by the company's stance on the matter. This is particularly concerning as the senior leadership for Defendant TMF is virtually entirely Caucasian.

99.    Additionally, in July 2020 the company added a training in "unconscious bias." In Plaintiff's role as Quality Improvement Executive and as a person with an established interest in the topic, Plaintiff shared his comments and concerns about the racist messaging being relayed by the training itself:

> From: Jay Crosson
> To: Russell Kohl
> Subject: FW: Required Training - Understanding Unconscious Bias
> Date: Wednesday, July 8, 2020 1:44:00 PM
>
> Hi Russell,
>
> I completed this training today and think it is a good first step for this "ongoing effort" that Stephen references. Some issues I noticed with the material: 1) it is from the UK and does not reference in any way the historical or cultural environment in which we work. This has the unintended and unfortunate effect of minimizing the history and context of systemic racism in the US; 2) it essentially normalizes bias and discriminatory behaviors by attaching them to evolutionary adaptations and brain functioning – although it does try to help people learn to become conscious of these processes; 3) it is divorced from the TMF organizational context and presents bias as an individual rather than an organizational or systemic problem – this has the effect of minimizing TMF's responsibility to address these issues; and 4) the material was released in 2017 (and likely developed before the current administration took office in the US) and thus does not address issues that have arisen since then in the US context.
>
> Regards,
>
> Jay
>
> **Jay Crosson, Ph.D.**
> **Quality Improvement Executive, Research and Assessment**

**TMF Health Quality Institute**
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
Pronouns: he, him, his
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

100.    Despite being aware of the pattern of discrimination and racial prejudice, Defendant TMF perpetuated the racist and discriminatory nature of the workplace with a training designed to educate employees on unconscious bias.

101.    Plaintiff explained racism is not excusable and cannot be rationalized by a healthcare company as *"evolutionary adaptations and brain functioning."* In addition, Plaintiff explained the United States (especially as of late) and the United Kingdom are not comparable when discussing discrimination issues.

102.    Furthermore, Plaintiff, who identifies as Jewish, told Dr. Kohl that employees have made comments that were uncomfortably close to the two classic anti-Semitic tropes of "pushy" and "cheap" behavior. Dr. Kohl simply replied that he had *"never heard anyone say anything antisemitic at TMF,"* but did not otherwise address the matter.

103.    In addition, at numerous points throughout Plaintiff's employment, Plaintiff was told he *"does not speak Texan."* When asked to clarify, Dr. Kohl stated Plaintiff has a *"northeastern style of communication that rubbed the head of Business Development the wrong way since she has more of a Southern, even antebellum style of communication"* (speaking about Defendant Lovato).

104.    Plaintiff was born in Florida and Defendant Lovato is also thought to have been born in Florida, meaning there is no reasonable distinction between the two. These consistent comments are similar to the classic anti-Semitic tropes.

105.    Defendant Manley, Defendant TMF's CEO, also sent an email about the upcoming holidays in September 2020, ironically as part of the information from the new diversity group.

106.    Despite the fact that Rosh Hashanah (one of the most important holidays on the Jewish calendar signifying a new year), and Yom Kippur (one of the holiest holidays on the Jewish calendar signifying atonement) both fall in September, the only holiday highlighted by Defendant Manley was "Grandparents Day":

> From: Erin Boeck <Erin.Boeck@tmf.org> **On Behalf Of**
> Tom Manley Sent: Thursday, September 10, 2020 9:39 AM
> Subject: CEO Update September 10, 2020
>
> **CEO UPDATE SEPTEMBER 10, 2020**
> […]
> *UPCOMING HOLIDAYS & OBSERVANCES*
> The Diversity Planning Workgroup is maintaining a calendar to
> highlight holidays and observances throughout each month. Please
> contact a workgroup member with any recommendations.
> > **Grandparents Day, Sept. 13**
> > On the Sunday following Labor Day, National
> > Grandparents Day honors the love only grandparents can
> > provide.

107.    Instead of working with Plaintiff to fulfill his job duties in his executive role and aid his efforts to cure prejudice in a predominantly white company, Defendants resisted his ideas, made racist comments, and proceeded to insult him and his own religion.

### In Retaliation for Plaintiff's Complaints of Discrimination, Defendants Drum Up Bogus Disciplinary Issues Against Plaintiff, Subject to Him to a Sham Investigation Designed to Cover Up the Discrimination/Retaliation

108.    As highlighted above, Plaintiff was an exemplary employee with Defendant TMF.

109.    Plaintiff worked well with his colleagues and was an asset to the company.  His experience and ideas increased revenues and decreased expenditures during his employment.

110.    Plaintiff received frequent positive feedback, such as, ***"you blew it out of the water," "you're doing awesome and pushing us to be better,"*** and even direct and personal compliments from Defendant TMF's CEO, Defendant Manley.

111.    In addition, Plaintiff's yearly performance review was so positive that it resulted in a sixteen thousand-dollar ($16,000) bonus in February 2020.

112.    Although Plaintiff received multiple positive performance reviews, congratulatory emails about his efforts, and a substantial performance bonuses, Defendants manufactured a slew of baseless complaints in a sham investigation against Plaintiff in retaliation to his diversity efforts and attempts to stamp out discrimination in the workplace.

113.    Seemingly out of nowhere, on September 8, 2020, Plaintiff was told via email that complaint had been filed against him by an employee of Defendant TMF:

> From: Stephen Thomas
> To: Jay Crosson Subject: Private and Confidential – Notice of Complaint
> Date: Tuesday, September 8, 2020 5:33:58 PM
> Importance: High
>
> Dear Mr. Crosson,
>
> A complaint has been brought against you for unprofessional conduct and behavior that negatively affects the work environment of other employees.
>
> In particular, several personnel in the Business Development Office allege that you have demonstrated a pattern of obstructive, disrespectful, and rude behavior when interacting with their staff to include withholding resources and assistance. Additionally, the allegations noted that this behavior was present when interacting with other employees and teams throughout the Company.
>
> We have just received this complaint and, I must emphasize that we have not formed any conclusions or made any prejudgments about these allegations. We did, however, wish to bring it to your attention so that you can assist us in our investigation and have a fair

opportunity to present your views and any explanations. We will be providing you additional information as the investigation proceeds.

The Company is committed to ensuring that all company-initiated investigations are conducted in a fair, impartial, thorough, thoughtful manner and in compliance with all applicable federal, state, and local laws.

The Company prohibits retaliation including making threatening communication by verbal, written or electronic means against any individual who reports or provides any information concerning unlawful discrimination, harassment or other violations of company policies, rules and standards of conduct. Any employee found to be engaging in retaliation will be subject to disciplinary action up to and including termination.

Employees must also comply with reasonable requests from the Company investigator(s) regarding the investigation. Employee non-compliance and/or intentional or bad faith interference with an investigation may be subject to disciplinary action.

I will be reaching out to you for your responses after I have interviewed staff.

If you have any questions in relation to the above information, please do not hesitate to contact me.

**Stephen D. Thomas, SPHR, CCEP, CFE**
**Senior Advisor to the President and CEO**
**Chief Human Resources Officer**

114.    Plaintiff received this email while working in his New Jersey officer.

115.    Plaintiff was shocked by this development, but immediately knew the complaint was pure retaliation and an effort to orchestrate his termination.

116.    Indeed, before this pretextual complaint, Plaintiff had not received any poor performance reviews or negative feedback regarding his behavior. To the contrary, Plaintiff's performance was exemplary.

117.    Notably, Plaintiff was never interviewed or asked to provide information in connection with the investigation.

118.    Rather, one month later, a "draft" report was issued to Plaintiff on October 7, 2020, whereby he was given only five (5) days to respond to the allegations:

> From: Stephen Thomas
> To: Jay Crosson
> Cc: Russell Kohl
> Subject: Complaint
> Date: Wednesday, October 7, 2020 11:56:48 AM
> Attachments: Investigation Summary -- Jay Crosson (October 2020) Draft.pdf
>
> Mr. Crosson,
>
> Attached is the complaint summary. Please provide any comments you wish to be included in the file. Yesterday, I was advised that another program area employee had made a complaint against you to their supervisor. I will be reviewing this complaint and may add to this report or initiate a new investigation as appropriate.
>
> Please provide any comments you wish to provide no later than Monday, October 12, 2020.
>
> **Stephen D. Thomas, SPHR, CCEP, CFE**
> **Senior Advisor to the President and CEO**
> **Chief Human Resources Officer**

### Complaint Investigation – Jay Crosson
### October 2020

A complaint was filed with Human Resources alleging that Jay Crosson has shown a pattern of disrespect to employees in the Business Development Office (BD) and demonstrated behaviors that were detrimental to a collaborative work environment.

**Complaint Issues and Investigation**

The following items were identified by Business Development staff and other personnel as representative behaviors demonstrated by Jay Crosson on numerous occasions and with various work groups. These behaviors were also corroborated by staff outside of business development that were present at these meetings.

1)   When presented on 8/20 with the resume design with BD's proposed revisions (incorporating features BD adapted from competitors' resumes), Jay said that certain additions were

"terrible" and looked like "amateur hour."  Jay indicated he wasn't going to spend more time on the resume project if BD didn't take his recommendation to use his preferred template.  ("If you don't want to listen to that, I have other things to do.") During this meeting an attempt was made to diffuse Jay's ire and it was advised that maybe the template should be shared with senior leadership to get their opinion. Jay advised that "I am senior leadership" and inferred his opinion was what counted.

2) During a website design meeting he was dismissive of the work of employees and publically referred to the current website as "terrible".

3) During a business development meeting, Crosson was asked to provide continued Analytics support for new proposals and he responded by saying, "I estimate that we will have no staff available for business development work until June 2021" without offering any alternatives or solutions.

4) In August, Crosson served as a reviewer on the NAEMT proposal with Business Development Staff providing comments. During that conversation he was very critical of the NAEMT proposal and said every proposal TMF produces is garbage.

5) It was noted that he has been very disrespectful of bid decisions and strategy made by the Business Development Officer (in consultation with other TMF leadership) and questions these decisions in front of other staff in a manner that is not conducive to collaboration.

6) Finally, a comment was made that during the January 2020 Strategic Planning meeting that Crosson was rude and condescending toward other attendees. It was stated that he had to prove he was the smartest person in the room.

A staff member made the following comment. "His professional attitude and negativity towards TMF's work has given me pause." Additionally, comments outside of Business Development include that he is condescending, prone to temper tantrums when he doesn't get his way, and belittles people.

**Discussion**

Mr. Crosson's behavior could be summed up as a form of bullying. A subtler type of office bullying is sometimes known as smart bullying. An individual engaging in this type of intimidation often considers himself or herself to be an expert on just about any subject, and is not shy about sharing that knowledge with everyone else. Often, the tone used to deliver this knowledge is calculated to

imply that the recipient lacks the knowledge or skill necessary to assimilate the data and be efficient around the office, thus undermining the confidence of others.

In addition, his interactions with other employees could be perceived as creation of an offensive work environment or more commonly referred to as a hostile work environment, a civil law term that refers to the behavior of an individual in a workplace that creates an environment that makes work difficult or uncomfortable for another person. For this behavior to reach a legal liability, the conduct must create a work environment that would be intimidating, hostile, or offensive to a reasonable person.

**Summary**
In accordance to TMF policy, Jay Crosson has exhibited behavior that negatively affects the productivity or work environment of other employees and behavior that is unprofessional or shows a lack of respect for others and warrants disciplinary action.

**Stephen D. Thomas, SPHR, CCEP, CFE**
**Senior Advisor to the President and CEO**
**Chief Human Resources Officer**

119.    The complaint, report, and investigation were completely bogus for numerous reasons.  Plaintiff received and reviewed this report in his New Jersey office.

120.    To begin, the August 20, 2020 meeting regarding criticism of a template redesign is falsely attributed to Plaintiff.  In reality, the template was developed through a collaborative process involving the head of communications (Emilie Fennell), a communications staff person (Jodi Bowen), a staff member from business development (Erin Van Landignham), and another member of the innovations group (Kris Calderon).

121.    After the meeting, Plaintiff and Greg Walker, Defendant TMF's proposal director, spoke about letting business development update it instead, to which Mr. Walker agreed and emailed Plaintiff thanking him for his work and that ***"today's call was helpful."***  Specifically:

From: Greg Walker <Greg.Walker@tmf.org>
Sent: Thursday, August 20, 2020 3:58 PM

To: Jay Crosson <Jay.Crosson@tmf.org>; Kris Calderon <Kris.Calderon@tmf.org>
Subject: Resume redesign project

Jay and Kris,

Thank you both for your work and thoughts on a new resume design for TMF. I hear you clearly that you are not satisfied with the BD team's suggested revisions to the design. As discussed, I will take your concerns back to the team for further consideration. I do think the team has been focused on addressing client/customer needs with the new design, but I will make sure this is explicitly the guiding principle when making design decisions.

If you have any further questions or concerns, please let me know.

Thanks again,

Greg

…

From: Jay Crosson <Jay.Crosson@tmf.org>
Sent: Thursday, August 20, 2020 3:02 PM
To: Greg Walker <Greg.Walker@tmf.org>; Kris Calderon <Kris.Calderon@tmf.org>
Subject: RE: Resume redesign project

Thanks for your efforts on this Greg. I wish you the best of luck with the process.

Regards,

Jay

Jay Crosson, Ph.D.

…

From: Greg Walker <Greg.Walker@tmf.org>
Sent: Thursday, August 20, 2020 4:34 PM
To: Jay Crosson <Jay.Crosson@tmf.org>
Subject: RE: Resume redesign project

Thanks, Jay . . . I'll take any luck you can offer!

Seriously, though, I think I need to spend some time drilling down on why certain individuals have strong opinions on certain features. Today's call was helpful in reiterating that the reasoning for any design decision must be to best address the needs of our potential clients or partners.

Kris tells me you'll be out of the office next week—I hope you enjoy the time off!

Greg

122.   All of the communication were sent to Plaintiff while he worked out of his New Jersey office.  Plaintiff replied from his New Jersey office.

123.   Plaintiff heard nothing else regarding this meeting on August 20, 2020 until the complaint was given to him by Defendant Thomas, which was almost three weeks later.

124.   Plaintiff's communications with Mr. Walker after the meeting show Plaintiff was not making the statements he was accused of, the conversations and recommendations were completely civil and constructive, and Plaintiff was not inferring his opinion was the only one that mattered, as he was giving the work to someone else.

125.   Plaintiff was also accused of being *"dismissive of employee work,"* which, too, is false. For example, Plaintiff has offered opinions about the design of the company website, however he has specifically thanked the lead communications staffer (Hope Stehling) who is redesigning the website for her hard work and attention to detail:

From: Debbie Lovato <Debbie.Lovato@tmf.org>
Date: Tuesday, Apr 07, 2020, 6:01 PM
To: Jay Crosson <Jay.Crosson@tmf.org>
Cc: Kris Calderon <Kris.Calderon@tmf.org>
Subject: Conversation with Tom - TMF Website

I conveyed your concerns regarding the TMF Website with Tom and he is very open to suggestions for improvement.  He asked that you and Kris schedule a meeting with Emile and Hope regarding your suggestions for improvement.  It sounded like you have had some

conversations with Emile on rebranding but would be good to meet
again to revisit and brainstorm suggestions for improvement.

Debbie Lovato, RN
Business Development Officer
TMF Health Quality Institute

Direct: 512-334-1618
Cell: 512-[REDACTED]

126.    Plaintiff had an excellent, professional relationship with Emile Fennell, Director of

Communications and External Relations. He offered his help to work on the website, as he was

told Defendant Manley is *"very open to suggestions for improvement."*

127.    Ms. Fennell agreed to work on the website improvements with Plaintiff. Thanking

an employee for his or her work is the opposite of dismissive.

128.    The complaint also alleges Plaintiff did not offer any alternatives or solutions to

having no staff available for business development work until June 2021. This allegation, too, is

false.

129.    Plaintiff offered to handle all such requests himself until the near-term staffing

availability problems could be solved.

130.    Plaintiff never refused any resources to business development and has been

proactive about supporting any and all proposals.

131.    Plaintiff was also thanked by Mr. Walker for his help and attention to anticipated

staffing challenges.

From: Jay Crosson <Jay.Crosson@tmf.org>
Sent: Tuesday, August 4, 2020 2:14 PM
To: Russell Kohl <Russell.Kohl@tmf.org>; Debbie Lovato
<Debra.Lovato@tmf.org>; Greg Walker
<Greg.Walker@tmf.org>; Erin Van Landingham
<Erin.VanLandingham@tmf.org>
Subject: RE: Technical/SME Lead for TQMC

I think the third option presented here is the best one. ***For the upcoming efforts, I will handle the business development needs myself.*** Please feel free to loop me in to whatever you decide to pursue.

Regards,

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
Pronouns: he, him, his
www.tmf.org or http://tmfqin.org
***Improving Lives by Improving the Quality of Health Care***

…

From: Jay Crosson <Jay.Crosson@tmf.org>
Sent: Wednesday, August 5, 2020 11:49 AM
To: Greg Walker <Greg.Walker@tmf.org>; Debbie Lovato <Debra.Lovato@tmf.org>; Erin Van Landingham <Erin.VanLandingham@tmf.org>
Cc: Russell Kohl <Russell.Kohl@tmf.org>
Subject: RE: Technical/SME Lead for TQMC

I think the safest option at this point is to ***designate me as the lead.*** If time gets freed up, we can bring in another member of the team as well.

Regards,

Jay

Jay Crosson, Ph.D.
Quality Improvement Executive, Research and Assessment
TMF Health Quality Institute
Phone: 732-[REDACTED]
Email: jay.crosson@tmf.org
Pronouns: he, him, his
www.tmf.org or http://tmfqin.org
***Improving Lives by Improving the Quality of Health Care***

…

From: Greg Walker <Greg.Walker@tmf.org>
Sent: Wednesday, August 5, 2020 12:54 PM
To: Jay Crosson <Jay.Crosson@tmf.org>; Debbie Lovato
<Debra.Lovato@tmf.org>; Erin Van Landingham
<Erin.VanLandingham@tmf.org>
Cc: Russell Kohl <Russell.Kohl@tmf.org>
Subject: RE: Technical/SME Lead for TQMC

Jay,

That sounds good—thanks!

*Again, I appreciate you bringing to our attention the anticipated staffing challenges in the Analytics Group in the near future.* Let's definitely keep in touch as this develops.  I definitely want to be sure our contracts are getting the analytics support they need and never want BD activities to hamper performance on any of these.

Thanks again,
Greg

132.    All of the communication were sent to Plaintiff while he worked out of his New Jersey office.  Plaintiff replied from his New Jersey office.

133.    Not only did Plaintiff offer up his own time to help, he was also thanked for his attention to anticipated staffing challenges. The allegation that Plaintiff was being difficult to work with by offering no solutions to having to remedy the lack of available staff for business development work is untrue and completely baseless.

134.    Plaintiff was further accused of saying *"every proposal TMF produces is garbage."* Plaintiff never made this statement.   Rather, he professionally critiqued business development proposals (including the one referenced in the draft findings document) as he was asked to do.

135.    Plaintiff asked Erin Van Landingham, of the business development team, when the proposal was due as he was willing to rewrite it. She told Plaintiff it was essentially already sent,

even though they had asked for Plaintiff's review. Plaintiff stated the existing process of writing proposals did not produce the highest quality proposals (something that CMS has confirmed in its recent ratings of TMF proposals) and that if different results were wanted, the process would need to change.

136.    Notably, Plaintiff is on the executive management team and is invested in the success of Defendant TMF, as evidenced by his concerns revolving around the diversity issues at the company and his attention to detail with proposal review.

137.    Plaintiff's job is to critique proposals, especially in the case of being specifically asked to do so, to make the proposals better which then makes Defendant TMF better.

138.    The complaint also falsely states Plaintiff is ***very disrespectful of bid decisions and strategy made by the Business Development Officer.*** Plaintiff was a member of the senior leadership of the company, so critiquing decisions and strategy to make the company grow is part of his duty. As shown above, Plaintiff is a problem solver and cared deeply about the company and its image.

139.    Finally, Plaintiff allegedly made a ***"rude and condescending comment"*** at a meeting in January 2020, ***ten months prior to this complaint***. Plaintiff was not made aware of any issues with his behavior since the receipt of the complaint and no basis to this allegation has been made by Defendant TMF. Notably, he was paid a performance bonus of more that $16,000 in February 2020 following this meeting.

140.    Defendants go as far to state ***"Mr. Crosson's behavior could be summed up as a form of bullying."***

141.    The irony and pretext could not be more clear – although Plaintiff consistently pointed out racial prejudice and the diversity issues at Defendant TMF, Defendants swept Plaintiff's reporting of such conduct under the rug.

142.    Instead of taking steps to improve the diversity issues and racial bias in the workplace, Defendant TMF created a sham investigation against Plaintiff to pretextually terminate his employment.

143.    This investigation and the allegations made against Plaintiff are in retaliation for his engaging in protected conduct.

144.    Pursuant to Defendant Thomas's request, from his New Jersey office, Plaintiff responded in writing to each of the baseless allegations made against him.  Specifically:

> **From:** Jay Crosson <Jay.Crosson@tmf.org>
> **Date:** October 9, 2020 at 6:19:48 PM EDT
> **To:** Stephen Thomas <Stephen.Thomas@tmf.org>
> **Subject: RE: Complaint**
>
> Mr. Thomas,
>
> I am in receipt of the draft "Complaint Investigation." Needless to say, I believe that the complaints brought against me are not only unfounded, they are retaliatory. I have always tried to share my understanding of industry best practices across a wide variety of company processes based on my prior experience and on my research. My supervisor has encouraged me to do so and has never told me that this constituted "bullying." I have tirelessly conducted my efforts to improve company efficiency and ensure more productive use of resources - as I am held accountable for company bottom line performance as part of my compensation. My work and track record speaks for itself, but I note that recent reviews from my direct supervisor throughout this period have been glowing: "you are crushing it," "you are doing awesome." While it saddens me to learn that these efforts are interpreted as showing a "lack of respect," the reality is, the complaints against me are nothing more than a concerted effort to force my resignation or cover up an otherwise unlawful termination. Whatever investigation the company purported to conduct was a complete sham and was designed to punish me. This investigation was never designed to give me a fair

opportunity to defend myself against baseless accusations – I was not even interviewed or offered the opportunity to submit documents prior to receiving your "findings." As you know, I have repeatedly attempted to broaden the company's horizon on diversity matters. I have been met with resistance and retaliation and received push back on diversity efforts that are not only the right thing to do, but in line with the company's core values. For example:

1.      On April 28th, I had a call with an HR specialist in the company to discuss the need for educational qualifications on some technical and professional level job descriptions that I was working on as part of the reorganization of the analytics group. I was told on the call that we could not include an educational requirement (even though the job is highly technical) because "black people" don't get masters and doctoral degrees at "the same rates" and thus asking for these credentials would somehow constitute discrimination. I pointed out to her that this statement was in itself a "racist statement." She then said that she is "not being racist" by saying this. I reminded her that I was not saying that she was being racist but rather that the statement she made was a racist one. She then got more confrontational about this and I cut her off saying "this conversation is disturbing on so many levels that I can no longer continue having it with you." I then hung up. I discussed this interaction with my supervisor and he instructed me to report it to the company Compliance Officer. I did that via email and phone on the same day. Somehow my complaint was unsubstantiated.

2.      In early May 2020, I again brought up concerns about diversity in the company. Pointing out that some of the ways we describe our positions may be discouraging the most qualified minority applicants. My supervisor reportedly brought those concerns to the CEO and reported to me on May 11th that focused recruiting may be needed. Later the same day, the compliance officer emailed me to let me know that the HR staff member in the initial interaction described above should have "reset the discussion with a neutral reference to how TMF manages AAP." In addition, he stated that without a new "branding campaign" it would not be possible to add degree requirements to technical positions without creating "EEO risks." Later on the same day, he characterized my suggestions as risky and said that after legal review "TMF is risk averse on this."

3.      Following the murder of George Floyd on May 25th, I reached out to my supervisor by phone to let him know that I thought it was appropriate for the company to make a statement that "black lives matter" and on June 1 volunteered to help in any way needed with diversity and inclusion work. On June 2nd I sent my supervisor an email about the police violence during protests in Austin

suggesting that TMF "make a statement by email to TMF employees committing TMF to fighting racism, ensuring that all members of the staff have a home at TMF, and offering support services to staff who may need them during this upsetting period." No such statement was made.

4.      On June 16, I again reached out to my supervisor to provide some feedback on a proposed internship program that he thought could be a part of a diversity initiative at the company. In that email I stated: "I think TMF needs to add diversity, equity, and inclusion to our list of core corporate values and then develop an internal initiative to operationalize and publicize those values and how they fit with and inform our other core values. Finally, the silence of company leadership on racism at this time is likely to present a barrier when seeking more diverse candidates for either the internship or employment more generally moving forward. The longer we wait to speak out, the more it will look like we are speaking from a position of guilt rather than one of commitment on these issues. Our work is intended to improve the lives and health of Medicare beneficiaries specifically and of all Americans more generally. Given that background I find it incongruous that we are unable to say that Black Lives Matter." His response to me by phone was that this was reviewed by the company attorney and that the attorney had said something to the effect of "if you do that, you will never get another CMS contract." Of course, that is simply false. I once again became concerned that the company's purported diversity values were in name only.

5.      On July 2, I shared an article on confronting structural racism in research and policy analysis with the head of communications (who is now the designated lead for an internal diversity group) which she told me would be forwarded on to the CEO and head of HR. I did not hear back from either of them on this. This was another red flag.

6.      On July 7, I alerted a technical proposal lead that they had misused an analytics staff person's name. The staff person is South Asian. The person misusing her name replied and thanked me, as did the analytics staffer. On the same call, the head of business development misgendered the same staff person. I sent her an email on this and also an email to the staff person letting her know that I am available to her "if there are other instances in which you are experiencing these types or other sorts of microagressions" so that I can follow up. I shared both of these instances with my supervisor but I never heard back from the head of business development. There is an obvious pattern here, and a need for leadership to address these issues.

7.      In mid-July, during a hiring process for an entry level position in the group that I lead (analytics), I became concerned

about the screening process that was used for initial applicants. The process used by HR had led to a final pool of candidates that did not appear to include any black or Latinx candidates despite my efforts to target the listing to graduates of historically black colleges and universities and other public universities noted for their diversity through sharing on LinkedIn. As I am concerned about the effectiveness of minority recruitment efforts, I asked a question of the HR lead and asked if they could share the demographics of the initial applicant pool. The staff person told me that this would violate "EEO" rules as I might use the information to discriminate. After some back and forth with HR, during which they informed me that reading cover letters unless they are specifically required in the job posting is "discriminatory," we had to repost the position and start over. The final candidate that I authorized hiring was an African-American woman just out of graduate training. If I did not advocate for this type of initiative, this candidate (and many other minorities) may have been overlooked.

8.      In July, the company added a training in "unconscious bias." I completed the training. On July 8, in my role as a quality improvement executive and as a person with already established interest in this topic, I shared my comments and concerns regarding the unconscious messages relayed by the training itself. Specifically, I noted that the program had been developed several years before the current incidents relating to racism, was set in a British context, and did not include US-specific examples. I noted my concern that this could send a subtle message that the company is not really committed to addressing these issues but is only going through the motions.

9.      I have experienced discrimination myself. At numerous points in conversations with my supervisor prior to your email I was told that I "don't speak Texan." When I discussed the email complaint with him by phone on 9/17, I pointed out the fact that the two allegations in your initial email were uncomfortably close to two classic antisemitic tropes: "pushy" and "cheap" and that people at the company know that I identify as Jewish. I also pointed out to him that the most recent communication from the CEO had highlighted the holidays upcoming in September as part of the information from the new diversity group. Despite the fact that the Jewish high holidays were fast approaching, the only holiday that was highlighted and described for September was "Grandparents Day." He assured me that he had "never heard anyone say anything antisemitic at TMF" and that he would characterize me as having a "northeastern" style of communication that had rubbed the head of business development the wrong way since she has a more "Southern, even antebellum" style of communication. I pointed out that both the head of business development and I are native-born

Floridians and that I did not consider that to be a reasonable distinction to draw.

10.    In addition, I find it troubling that this investigation comes at the 2-year mark of my employment when I will soon be vested in company contributions to my retirement account. As a 56-year old employee, a loss of these benefits would be especially significant.

To be clear, before this investigation even began, I sounded the alarm about the lack of diversity and about discriminatory bias in the workplace. I was doing my job and following our so-called policies. While I have already explained to my direct supervisor that I thought the entire process around this complaint was retaliation for raising complaints and concerns about discrimination, it is now apparent to me that the investigation process itself was retaliation for bringing up racism as an issue at the highest levels of the company on multiple occasions.

While I am hesitant to do so (responding seems to dignify the matter), here is my point-by-point response to the specific claims in the draft findings document:

Point 1) the description of the meeting on 8/20 regarding the proposed revisions to the resume template falsely attributed the template design that was under discussion to me ("his preferred template"). In fact, the template under discussion had been developed through a collaborative process involving the head of communications (Emilie Fennell), a communications staff person (Jodi Bowen), a staff member from BD (Erin Van Landingham), and another member of the innovations group (Kris Calderon) and represented the consensus of the group. Greg Walker (from BD) then met with this group to let us know the feedback from BD on what the group had created. His feedback rejected all of the ideas of the group and reverted the look and feel of the document to the original design that we had been tasked with updating. I told him at the time that there was no point in continuing the process at this point since it appeared that the decision makers were the head of BD (and him). He suggested continuing the process, but I told him that it would be better for BD to take things from here. Later that day, Greg sent me an email thanking me for my "work and thoughts" on the design and agreed to take the concerns back to the BD team. I thanked him for his efforts and wished him the best of luck with the process going forward. He then responded that "today's call was helpful" and that he would "take any luck you can offer!" I heard nothing further until the complaint.

Point 2) I was never dismissive of the work of any particular employee. I offered my unvarnished opinion about the state of the company website and its usefulness from a marketing perspective.

The head of communications has on multiple occasions agreed with me on the need for substantially revising the website look and feel. Throughout this process, I have been especially mindful to thank the lead communications staffer redesigning the website (Hope Stehling), offering my sincere thanks for her hard work and attention to detail. The redesign process has been collaborative and collegial throughout.

Point 3) I gave an accurate assessment of analytics staff support availability for new proposals. The assessment was communicated to my supervisor on numerous occasions with detailed data presentations. While I was out on PTO, my supervisor gave similar information using a different data source during a collaborative call between BD and the innovation group. Following my assessment, and discussion with my supervisor, I offered a solution for meeting these needs. Specifically, I offered to handle all such requests myself until the near term staffing availability problems could be solved. I have never refused any resources to BD and have been proactive about supporting any and all proposals.

Point 4) I was asked to provide a last-minute review of the NAEMT proposal. It was my professional assessment that the proposal was poorly written and sloppily conceptualized. I asked the BD staff member (Erin Van Landingham) about the due date of the proposal and offered to rewrite it if there was time. She told me that it was already essentially out the door (why I was asked to review remains unclear) and that unfortunately there would not be an opportunity to revise this particular draft. She then asked me if I thought that the quality of this proposal was representative of other proposals I had reviewed for TMF. I told her that the existing process did not produce the highest quality proposals (something that CMS has confirmed in its recent review of TMF proposals) and that if we wanted a different result it would need to change. I do not think that TMF proposals are "garbage." Rather, I think that improvement of technical quality is a business opportunity and is required for future growth of the company.

Point 5) I regularly question bid decisions and strategy in order to provide the most effective support possible to BD efforts. As a member of the senior leadership of the company, I think that this is my duty. Recently, I questioned such a strategy decision on a proposal development call and was told, "we're not going to discuss that." Following the meeting, I worked with the designated senior analyst for the proposal (Bethany Gabbard) to identify a staffing solution to support the proposal in question. This solution was offered less than one hour after the initial meeting with BD.

Point 6) I was not rude and condescending in the January 2020 Strategic Planning meeting and received no feedback regarding my behavior between the meeting in January and the receipt of this

document nearly 10 months later. In the interim period, I have alerted my supervisor to several issues at TMF relating to diversity, equity, and inclusion. Since I have no idea what this aspect of the complaint references, I am unable to respond to the substance of it. Notably, at the Strategic Planning meeting I was tasked with implementing the one action item agreed on for immediate action - leading the purchase and implementation of new accounting and business development data systems (Deltek Costpoint and Deltek GovWin). I have successfully completed this task on time and under budget, realizing a significant savings off the initial price presented by Deltek.

There simply is no merit to any of the allegations made against me. Although the company has been aware of the retaliation against me, no one has done anything about it. I am tired of being treated in this manner and I expect the company to do something about it now.

Thank you,

Jay Crosson, Ph.D.

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732 [REDACTED]
Email: jay.crosson@tmf.org
Pronouns: he, him, his
https://link.edgepilot.com/s/6a53b16b/H_4FKL_r1US7jQimXWE
P8Q?u=http://www.tmf.org/                                        or
https://link.edgepilot.com/s/9c880c86/r89BPZZOkkKbZiCDadOK
LQ?u=http://tmfqin.org/
*Improving Lives by Improving the Quality of Health Care*

145.   Plaintiff received no response to this email.

146.   Plaintiff was never interviewed, he was never asked to provide documents, he received no response to his complaints of prior discrimination/retaliation, he was never provided a warning or otherwise subjected to any progressive discipline (which would have been retaliatory too).

147.    Rather, Defendants immediately and summarily terminated Plaintiff's employment the following business day, October 13, 2020.    The letter was sent to Plaintiff via email and in hard copy to his New Jersey office.

148.    Defendant Thomas emailed Plaintiff the following and attached a separation agreement:

> **From:** Stephen Thomas <Stephen.Thomas@tmf.org>
> **Date:** October 13, 2020 at 4:01:34 PM EDT
> **To:** jesse.crosson@gmail.com
> **Subject: Separation Agreement**
>
> Mr. Crosson,
>
> Effective October 13, 2020 your employment with TMF has ended. Attached is a Separation Agreement for your review, execution and return to my attention. We will be sending you a copy by an overnight mail service. Information Security staff will be reaching out to you regarding return of equipment.
>
> Feel free to reach out if you have any questions.
>
> **Stephen D. Thomas, SPHR, CCEP, CFE**
> **Senior Advisor to the President and CEO**
> **Chief Human Resources Officer**
>
> **TMF Health Quality Institute** | Oak Creek Plaza, Suite 200 |
> 3107 Oak Creek Dr. | Austin, TX 78727
> 512-334-1726 Direct | 512-329-6610 Main | 512-334-1779 Fax |
> **stephen.thomas@tmf.org**

149.    According to the Separation Agreement presented to Plaintiff, Defendants falsely assert Plaintiff's employment is ***"being terminated due to a reduction in force." See Ex. A hereto.***

150.    The Separation Agreement and stated reasons for termination constitute a thinly veiled attempt to cover-up a pretextual and unlawful retaliatory termination.

151.    Plaintiff did not sign the Separation Agreement, and therefore, the Texas choice of law and venue provision is not binding, nor does it confer jurisdiction in any other district,

including without limitation Texas.  Ex. A., ¶9.

152.    The inconsistencies in these documents further prove Plaintiff was fired in retaliation for pointing out racial inequities in the workplace and for reporting specific instances of racial misconduct.

153.    Defendants did not have an effective anti-harassment policy in place, Defendants have not maintained an anti-harassment policy that is current and effective, and Defendants' anti-harassment policy existed in name only.

154.    Defendants did not maintain useful formal and informal complaint structures for victims of discrimination, harassment, and retaliation.

155.    Defendants did not properly train their supervisors and/or employees on the subject of discrimination, harassment, and retaliation.

156.    Defendants failed to institute appropriate monitoring mechanisms to check the effectiveness of the policies and complaint structures.

157.    Defendants did not have a commitment from the highest levels of management that discrimination and harassment will not be tolerated.

## **COUNT ONE – NJLAD RETALIATION/IMPROPER REPRISAL**

158.    Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

159.    Plaintiff complained and/or protested against the continuing course of harassing, discriminatory, and retaliatory conduct set forth at length above. Defendants had knowledge about these complaints and/or protests.

160.    As a direct result, Defendants took retaliatory action against Plaintiff.

161.    Defendants are vicariously, strictly and/or directly liable to Plaintiff for unlawful retaliatory conduct in violation of the NJLAD pursuant to N.J.S.A. 10:5-12(d).

162.    As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained emotional and pecuniary damages.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the LAD, punitive damages, pre- and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.    Reinstatement of employment and all benefits;
B.    Back pay and benefits;
C.    Front pay and benefits;
D.    Compensatory damages;
E.    Consequential damages;
F.    Reinstatement;
G.    Punitive damages;
H.    Prejudgment interest and enhancements to off-set negative tax consequences;
I.    Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J.    Such other relief as may be available pursuant to the LAD and which the Court deems just and equitable;
K.    Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;
L.    Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;
M.    Ordering Defendants to undergo anti-discrimination training;
N.    Ordering Defendants to undergo anti-retaliation training;
O.    Ordering Defendants to undergo anti-harassment training;
P.    Ordering Defendants to undergo workplace civility training;
Q.    Ordering Defendants to undergo bystander intervention training;
R.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;
S.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;
T.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;
U.    Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V.    Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W.    Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X.    Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y.    Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z.    Such other relief as may be available and which the Court deems just and equitable.

## COUNT TWO – NJLAD AIDING AND ABETTING LIABILITY
## AS TO INDIVIDUAL DEFENDANTS THOMAS, LOVATO, AND MANLEY

163.    Plaintiff repeats each and every allegation set forth above as if set forth more fully at length.

164.    Based on Plaintiff's attempt to increase diversity and inclusion at Defendant TMF, Defendant Thomas, Lovato, and Manley made up this retaliatory scheme full of false allegations to terminate Plaintiff.

165.    Individual Defendants treatment of Plaintiff violates the NJLAD which expressly prohibits any unlawful employment discrimination against any person because of any protected class characteristic, including, but not limited to race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy, sex, gender identity or expression, disability or atypical hereditary cellular blood trait of any individual, etc.

166.    Individual Defendants aided, abetted, incited, compelled and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Defendant TMF to commit acts and omissions that were in violation of the NJLAD by committing affirmatively harassing, discriminatory, and retaliatory acts toward Plaintiff in violation of the supervisory duty to halt or prevent harassment,

retaliation, and discrimination, rendering each of them individually and collectively liable to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

167.    As a proximate result of the aforementioned acts and omissions set forth herein, including disability discrimination, hostile workplace interactions, and pretextual attempts of explaining the discriminatory acts, Plaintiff has sustained emotional and pecuniary damage

**WHEREFORE**, Plaintiff demands judgment in his favor and against Individual Defendants on this Count, together with compensatory and equitable relief, all remedies available under the LAD, punitive damages, pre- and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.    Reinstatement of employment and all benefits;
B.    Back pay and benefits;
C.    Front pay and benefits;
D.    Compensatory damages;
E.    Consequential damages;
F.    Reinstatement;
G.    Punitive damages;
H.    Prejudgment interest and enhancements to off-set negative tax consequences;
I.    Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J.    Such other relief as may be available pursuant to the LAD and which the Court deems just and equitable;
K.    Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;
L.    Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;
M.    Ordering Defendants to undergo anti-discrimination training;
N.    Ordering Defendants to undergo anti-retaliation training;
O.    Ordering Defendants to undergo anti-harassment training;
P.    Ordering Defendants to undergo workplace civility training;
Q.    Ordering Defendants to undergo bystander intervention training;
R.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;
S.    Ordering Defendants to engage a research organization to assess the effectiveness

of their anti-retaliation training;

T.      Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U.      Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V.      Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W.      Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X.      Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y.      Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z.      Such other relief as may be available and which the Court deems just and equitable

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues.

Dated: January 19, 2021          By:      **/s/ Matthew A. Luber, Esq.**
                                          Matthew A. Luber, Esq. – NJ ID # 017302010
                                          R. Armen McOmber, Esq. – NJ ID # 018251998
                                          Christian V. McOmber, Esq. – NJ ID # 012292010
                                          Kelly E. Adler, Esq. - NJ ID # 019242008
                                          Charles J. Kocher, Esq. - NJ ID # 016952004
                                          McOMBER McOMBER & LUBER, P.C.
                                          39 East Main Street
                                          Marlton, NJ 08053
                                          Phone: (856) 985-9800
                                          Fax: (856) 263-2450
                                          *Plaintiff Jesse C. (Jay) Crosson, Ph.D.*

# EXHIBIT A

<u>CONFIDENTIAL SEPARATION AGREEMENT</u>
<u>AND RELEASE OF CLAIMS</u>

This Agreement is between TMF Health Quality Institute ("TMF") and Jesse Crosson ("Employee"). Employee's employment with TMF is being terminated due to a reduction in force. The undersigned parties have agreed that TMF will provide certain employment separation benefits to Employee in return for which Employee will release TMF, its officers, employees, trustees, owners, independent contractors, attorneys and affiliates (collectively, "Affiliates") from any and all claims or causes of action which Employee has or may have against TMF or any of its Affiliates arising out of or in any way related to Employee's employment with or by TMF including, but not limited to any claims specifically described in Paragraph 2 below (collectively, "Claims").

IN CONSIDERATION OF THE PROMISES AND COVENANTS HEREIN, TMF AND EMPLOYEE HEREBY AGREE AS FOLLOWS:

1.      <u>Terms</u>.

In consideration of this release and the severance payment, as set forth below, the sufficiency of which is acknowledged by the parties, the parties agree to the following settlement terms:

A.      <u>Severance Payment:</u>  TMF shall pay Employee the sum of $20,000.00, less authorized and required withholding according to the regular payroll practices of TMF (the "severance payment").  This voluntary severance payment is offered in TMF's sole discretion and TMF is under no legal obligation to make such severance payment.  Employee acknowledges receipt of this voluntary severance pay sum in consideration for Employee's release of all Claims, among other things, and that Employee would not otherwise be entitled to payment in the amount or manner set out in this Agreement. For information purposes only, as of October 8, 2020, you are 20% vested in the 401(k) Discretionary Nonelective Contributions.  You are always 100% vested in your Rollover Contributions, After-Tax Contributions, Qualified Nonelective Contributions, Deferral Contributions, Safe Harbor Matching Employer Contributions and any earnings thereon. The Severance Payment does not include any of these contributions which will paid as directed by you in writing in addition to the Severance Payment.

B.      <u>Reference Checks and Inquiries</u>: Employee shall refer any potential future employers seeking employment references to the TMF Human Resources Department which will provide a verification only of Employee's title, dates of employment, and salary.  If additional information is sought by a prospective employer, the Human Resources Department will explain to the prospective employer that TMF's regular policy and procedure prohibits disclosure of any further information.

2.      <u>Release and Discharge</u>.

In consideration for the settlement terms described in Paragraph 1, the receipt and sufficiency of which is hereby acknowledged, Employee hereby knowingly and voluntarily releases TMF and its Affiliates from any and all past, present, or future claims or causes of action of any kind, including but not limited to claims or causes of action relating to Employee's employment or the separation of employment, including any claims:

a. of  wrongful termination, and those arising under any Federal or state law or regulation, including, but not limited to Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e <u>et seq</u>.; the Age Discrimination in Employment Act, 29 U.S.C. §§  621, <u>et seq</u>.; the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 <u>et seq</u>. and §794;  the Americans With Disabilities Act, 42 U.S.C. §§ 12101 <u>et seq</u>.; the Civil Rights Act of 1866, 42 U.S.C. § 1981; 42 U.S.C. § 1983, 42 U.S.C. § 1985(3); 42 U.S.C. § 1988; the Employee Retirement and Income Security Act, 29 U.S.C. §§ 1001, <u>et seq</u>., including COBRA; the Family and Medical Leave Act, 29 U.S.C. §§ 2616, <u>et seq</u>.; the National Labor Relations Act, 29 U.S.C. §§ 151, <u>et seq</u>.; the Fair Labor

Standards Act, 29 U.S.C. §§ 201, et seq.; and/or any other similar federal, state or local statute, law, ordinance, regulation or order;

       b.      that TMF or any Affiliate has violated its personnel policies, procedures, handbooks, or any express or implied contract of any kind;

       c.      that TMF or any Affiliate has violated public policy, statutory or common law, including claims for personal injury, invasion of privacy, retaliatory discharge, negligent hiring, retention or supervision, defamation, intentional infliction of emotional distress and/or mental anguish, intentional interference with contract, negligence, detrimental reliance, loss of consortium to Employee or any member of Employee's family or any other tortuous act, and/or promissory estoppel; or

       d.      that TMF or any Affiliate is in any way obligated for any reason to pay Employee damages, expenses, litigation costs (including attorneys' fees), back pay, front pay, disability or other benefits (other than any vested 401K or accrued pension benefits), compensatory damages, punitive damages, and/or interest.

       This release does not extend to any obligations incurred under this Agreement.   Also excluded from the foregoing release by Employee are any claims which cannot be waived by law.

       Employee also hereby generally releases and forever discharges TMF and its Affiliates from any and all other causes of action, or claims of any type, whether in law, in equity, or otherwise, whether known or unknown, which Employee had or may have had prior to the date that this Agreement was signed.

       3.     <u>Return of Property</u>

       Employee agrees to return all property and proprietary information owned by TMF or its Affiliates currently in the possession of Employee.

       4.     In addition to waiving and releasing the claims covered by paragraph 2 above, Employee further agrees never to sue TMF or any Affiliate in any forum for claims, laws or theories, covered by the general release above, other than to enforce this Agreement.  If Employee sues TMF or any Affiliate in violation of this Agreement, Employee shall be liable to TMF or any Affiliate for its reasonable attorneys' fees and other litigation costs incurred in defending against such a suit.

       5.     Nothing in this Agreement is intended to, or shall, interfere with Employee's rights under federal, state, or local civil rights or employment discrimination laws to file or otherwise institute a charge of discrimination for events subsequent to this agreement, to participate in a proceeding with any appropriate government agency enforcing discrimination laws, or to cooperate with any such agency in its investigation against TMF or any Affiliate.  Employee shall not, however, be entitled to any relief, recovery, or monies in connection with any actions that have been released herein, brought against TMF or any Affiliate, regardless of who filed or initiated any such complaint, charge, or proceeding.

       6.     The terms of this Agreement are confidential, and the parties agree not to publicize or disseminate the terms in any way, except to Employee's spouse, the parties' respective counsel and tax advisors, or as may be required by federal, state, or local tax authority or law, or to secure enforcement of the terms and conditions of this Agreement.

       7.     The Employee and TMF and all Affiliates and their officers, directors, and managers agree that they will not (i) defame, disparage or encourage or induce others to defame or disparage the other party, (ii) engage in any conduct or induce any other person to engage in any conduct that is any way injurious to either party's reputation and interests (including, without limitation, any negative or derogatory statements or writings),

or (iii) post any defamatory or disparaging statements or comments on any social media, internet site such as glassdoor.com or any similar site, or other form of electronic media. For sake of clarity, the parties agree that actions to enforce this Agreement or other legal rights shall not be construed to violate this Agreement.

8.    TMF and Employee understand and acknowledge that this Agreement constitutes a compromise and settlement of any and all claims or potential claims that Employee may have against TMF and all Affiliates as of the effective date of this Agreement. No action taken by the parties hereto, or either of them, either previously or in connection with this Agreement, will be deemed or construed to be: (a) an admission of the truth or falsity of any claims, or (b) an acknowledgment or admission by a party of any fault or liability whatsoever to the other party or to any third party.

9.    THE LAWS OF THE STATE OF TEXAS (EXCLUDING CONFILITS OF LAW RULES) SHALL BE APPLIED IN ANY CLAIM OR CAUSE OF ACTION ARISING UNDER OR RELATRING TO THIS AGREEMENT. VENUE OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER OR CONCERNING THIS AGREEMENT SHALL BE IN STATE COURT IN TRAVIS COUNTY, TEXAS. ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY THE COURT SITTING WITHYOUT A JURY, BY SIGNING TH IS AGREEMENT, EACH OF THE PARTIES WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY SUCH CLAIM OR CAUSE OF ACTION.

10.    Entire Agreement

This Agreement constitutes the entire agreement between Employee and TMF with regard to the matters set forth in it and supersedes any and all prior agreements, promises, representations, or inducements concerning the subject matter of the Agreement. No promises or agreements made subsequent to the execution of this Agreement by these parties shall be binding unless reduced to writing and signed by authorized representatives of these parties.

11.    Severance of Any Invalid Terms

Each provision and term of this Agreement is intended to be severable. The parties to this release agree that all provisions of this Agreement are material, but that should any one or more provisions of this Agreement be declared invalid by a court of competent jurisdiction, the provisions not declared invalid shall remain in effect as if the invalid provisions had not been contained herein, and the parties shall substitute for the affected provision an enforceable provision which approximates, as nearly as possible, the intent and economic benefit of the affected provision.

12.    Right of Revocation

Employee acknowledges that TMF advises Employee in writing to consult with an attorney before signing this Agreement. Although Employee may execute this Agreement as soon as Employee wishes, Employee also acknowledges that Employee has been given up to twenty one (21) days to consider whether to sign this Agreement. In order to be valid, this Agreement must be signed by Employee and returned to TMF no later than the 21st day after Employee receives it. If the signed Agreement is not received by TMF by that date, it will be considered expired and withdrawn. TMF will not pay Employee the severance payment described above unless and until Employee signs and returns this Agreement in a timely manner and the period of revocation described below has expired.

This Agreement does not become final and enforceable until seven (7) days from the date this Agreement is signed by Employee (the "Effective Date"). Employee may reconsider and revoke this Agreement at any time before this Agreement becomes final. In other words, Employee has the right to revoke this Agreement within seven (7) days of signing it. In order to revoke this Agreement, Employee must send a letter by certified mail to:

Stephen Thomas
TMF Health Quality Institute
3107 Oak Creek Drive, Suite 200
Austin, Texas 78727

If Employee revokes this Agreement, Employee will not be entitled to any of the "severance payment" described above. If Employee does not revoke this Agreement, Employee will receive the severance pay, when this Separation Agreement becomes final.

13. <u>Duplicate Originals</u>

This Agreement may be executed in duplicate and separate originals, each of which shall be binding as if executed together.

BY MY SIGNATURE BELOW, I REPRESENT THAT I HAVE READ THE FOREGOING CONFIDENTIAL SEPARATION AGREEMENT AND RELEASE OF ALL CLAIMS, THAT I UNDERSTAND IT, AND THAT I SIGN IT KNOWINGLY AND VOLUNTARILY.

EMPLOYEE


_____         DATE: _____
By:    Jesse Crosson


TMF HEALTH QUALITY INSTITUTE


By: _____         DATE: _____
         Thomas J. Manley, President and CEO

STATE OF _____        §
                               §
COUNTY OF _____            §

    The foregoing instrument was acknowledged before me this _____day of _____, 2020, by Jesse Crosson.


_____

_____
Typed or printed name of Notary

My Commission Expires: _____




STATE OF TEXAS                 §
                               §
COUNTY OF TRAVIS               §

    The foregoing instrument was acknowledged before me this _____day of _____, 2020, by Thomas J. Manley, President and CEO of TMF Health Quality Institute, a Texas corporation, on behalf of the corporation.


_____

_____
Typed or printed name of Notary

My Commission Expires: _____